J. Robert Nelson, et al. [1] v. Commissioner. Nelson v. Commissioner
Docket Nos. 5129-66 - 5133-66.
United States Tax Court
T.C. Memo 1968-203; 1968 Tax Ct. Memo LEXIS 98; 27 T.C.M. (CCH) 988; T.C.M. (RIA) 68203; September 16, 1968. Filed *98 William E. Guthner, Jr., Suite 1300, Empire Life Bldg., 611 Wilshire Blvd., Los Angeles, Calif., for the petitioners. Rogert Rhodes, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income taxes for the calendar year 1961 in the following amounts: Docket No.
Petitioners
Deficiency
5129-66
J. Robert Nelson
$ 665.96
5130-66
Luie Shinno and Ruth Shinno
103.40
5131-66
William H. Fiden and Ruth G. Fiden
384.00
5132-66
William G. Miller
121.50
5133-66
Kenneth A. Thompson and Nayda A. Thompson
3,196.66 989 Certain issues have been disposed of by the parties. The question remaining for decision is whether petitioners' gain on the sale of their stock in Ryan Communications, Inc., was long-term capital gain or was short-term capital gain because petitioners had not held their stock for more than 6 months at the date of its sale. [2]
*99 Findings of Fact Some of the facts have been stipulated and are found accordingly. J. Robert Nelson (hereinafter referred to as Nelson) is an individual whose legal residence at the time of filing of his petition in this case was Los Angeles, California. Luie Shinno (hereinafter referred to as Shinno) and Ruth Shinno are husband and wife whose legal residence at the time of filing of their petition in this case was Canoga Park, California. William H. Fiden (hereinafter referred to as Fiden) and Ruth G. Fiden are husband and wife whose legal residence at the time of filing of their petition in this case was Woodland Hills, California. William G. Miller (hereinafter referred to as Miller) is an individual whose legal residence at the time of filing of his petition in this case was Northridge, California. Kenneth A. Thompson (hereinafter referred to as Thompson) and Nayda A. Thompson are husband and wife whose legal residence at the time of filing of their petition in this case was Woodland Hills, California. Nelson and Miller each filed his individual Federal income tax return for the calendar year 1961 and Shinno, Fiden, and Thompson each filed with his wife a joint *100 Federal income tax return for the calendar year 1961 with the district director of internal revenue at Los Angeles, California. Since the wives of Shinno, Fiden, and Thompson are petitioners in this case only because of filing joint returns with their husbands, we will hereinafter refer to the husbands as petitioners or to each as a petitioner. In August 1960, The Ryan Aeronautical Co., a California corporation (hereinafter referred to as Ryan) and Frederick E. Bond and Harold F. Meyer (hereinafter referred to as Bond and Meyer, respectively) carried on negotiations with respect to the formation of a corporation to be called Ryan Communications, Inc. (hereinafter to be referred to as Communications), to engage in the development, manufacture, and sale of products and services involving the use of communications and other electronic equipment. These negotiations resulted in certain agreements between Ryan and Bond and Meyer which were set forth in a letter from Edward G. Uhl, Vice President of Ryan, to Bond and Meyer, dated August 24, 1960, and a Pre-Incorporation Agreement between Ryan and Bond and Meyer dated September 19, 1960. The letter reads in part as follows: During a meeting *101 held in my office on Tuesday, August 23, we agreed to clarify certain points of understanding so that Ryan, Bond and Meyer could be bound by these agreements. It is understood that the establishment of RYAN COMMUNICATIONS, INC., which you gentlemen will lead in creating business opportunities in the field of communications will require a maximum exposure of $500,000. The Ryan Company is prepared to finance this venture, recognizing this maximum exposure will occur sometime during the first two years of operation. I know that you recognize this financing will be made available to RYAN COMMUNICATIONS, INC., in several different methods depending upon the need and specific situation being covered. * * * To insure continuity of RYAN COMMUNICATIONS, INC., you gentlemen have agreed to enter into an employment contract with RYAN COMMUNICATIONS, INC., and the employment contract, when it is drawn up, will provide that if RYAN COMMUNICATIONS, INC. cannot for any reason carry through the contract, the Ryan Company will accept the obligation. To the best of my ability to interpret, these are the agreements that we made and I would appreciate receiving two copies of this letter signed by both *102 Messrs. Bond and Meyer to signify your concurrence therein. The Pre-Incorporation Agreement provided that the corporation should be organized by the parties within 90 days of the date of the agreement, who would compose its first board of directors and officers, and that its authorized capital should 990 consist of 50,000 shares of nonparticipating preferred stock $10 par value with 6 percent cumulative dividends per annum and 200,000 shares of no par common stock. The agreement provided as follows with respect to issuance of shares: It is agreed that the corporation, when incorporated, shall, as soon as possible thereafter, apply to the California Commissioner of Corporations for a permit authorizing the issuance of its shares to the person or persons and in the manner hereinafter set forth. (A) The corporation shall immediately issue to Ryan for cash Seven Thousand Five Hundred (7,500) shares of its preferred stock in an amount equal to the par value thereof. The balance of the authorized and unissued preferred shares shall be issued, if deemed necessary by the corporation's Board of Directors, at a later date, subject to obtaining an appropriate permit therefor from *103 the California Commissioner of Corporations. (B)(1) The corporation shall immediately issue to Ryan Twenty-Four Thousand (24,000) of its common shares for cash in the amount of One Dollar ($1.00) per share for a total of Twenty-Four Thousand Dollars ($24,000.00). (2) The corporation shall immediately issue Four Hundred (400) of its common shares to Bond and Four Hundred (400) of its common shares to Meyer in exchange for the transfer by Bond and Meyer to the corporation of all their right, title and interest in and to designs, ideas and know-how (including patent rights or rights in patent applications to which they have clear title) pertaining to the fields of communications and electronics and for promotional services rendered to the corporation prior to the issuance of said shares, and for employment contracts with the corporation; such issuance to be subject to obtaining appropriate permit or permits from the California Corporations Commissioner. (3) The corporation shall further issue to employees of the corporation other than Bond and Meyer, Two Thousand (2,000) shares of common stock, in exchange for employment contracts with the corporation or in exchange for the transfer *104 by said employees to the corporation of all their right, title and interest in and to designs, ideas and know-how (including patent rights or rights in patent applications to which they have clear title) pertaining to the fields of communications and electronics. The employees to whom such shares shall be issued, the number of shares to be issued to each such employee, and the terms and conditions pertaining to the issuance of such shares shall be determined by the corporation's Board of Directors, subject to obtaining an appropriate permit or permits from the California Corporations Commissioner. (4) The corporation shall further issue to Bond Six Hundred (600) of its common shares and to Meyer Six Hundred (600) of its common shares for cash in the amount of $1.00 per share for a total of $1,200.00 and in exchange for promotional services rendered to the corporation by Bond and Meyer, at such time or times as Bond and Meyer may, at their option, separately or together designate, but not later than five (5) years from the date of this Agreement, subject to obtaining an appropriate permit or permits from the California Commissioner of Corporations. (5) Ryan and Bond and Meyer each *105 agree to purchase from the corporation for the considerations as set forth herein and in accordance with this Article IV, the number and class of shares set forth herein. The agreement provided that Ryan should have the option to purchase the common stock of any other stockholder if such stockholder received an offer to purchase his stock which he desired to accept. It also provided that after 5 years Ryan would purchase the common stock of any other stockholder at a price to be computed under a formula set forth but at not less than $25 a share. The agreement provided that the corporation would enter into 5-year employment contracts with Bond and Meyer as president and executive vice president respectively at $30,000 a year salary. It also provided that all property, whether tangible or intangible, acquired by the corporation or the parties to the agreement during the continuation of their association with the corporation pertaining to the development, production, or sales related to communication or other electronic equipment should be the property of the corporation. The final paragraph of the agreement stated: All of the agreements contained herein, the documents necessary *106 to establish the corporation, and the issuance of stock as described herein shall have no force and effect until approved by the Secretary of State of the State of California and the California Corporations Commissioner, as may be required. Ryan was the financial backer of the new venture and Bond and Meyer were expected to attract other personnel who could, along with Bond and Meyer, contribute the know-how needed for the 991 proposed operations. Bond and Meyer were authorized to offer to prospective key personnel a total of not more than 2,000 shares of the corporate common stock. Bond and Meyer contacted Thompson, and Thompson in turn contacted Nelson, Shinno, Fiden and Miller. All of the above persons had been employed by the Ramo-Wooldridge Corporation. Prior to the time Thompson became employed by Communications he was informed by Bond and Meyer that he would be issued stock in Communications if he came to work for the corporation and entered into an agreement to transfer to Communications all his interest in designs, ideas and know-how, including patent rights and patent applications pertaining to the field of communications and electronics. Thompson was also informed *107 that he would be expected to sign an agreement restricting the sale of his stock in accordance with certain repurchase options set forth in the Pre-Incorporation Agreement. Thompson told those whom he had contacted that they would be entitled to some shares of stock of the corporation in return for coming to work for and rendering services to Communications and transferring to the Corporation their right, title, and interest in designs, ideas, and know-how, including patents and patent applications related to communications and electronics, and that they would be expected to agree to the repurchase agreement. Communications was incorporated under the laws of California on September 19, 1960. The initial board of directors of Communications consisted of T. Claude Ryan, Robert C. Jackson, Edward G. Uhl, Bond, Meyer, Nelson, and Thompson. On September 19, 1960, the first meeting of the board of directors of Communications was held. The minutes of that meeting state in part: RESOLVED: That the Treasurer or Secretary of this corporation be and he hereby is authorized and directed to prepare or cause to be prepared, verified and filed on behalf of this corporation an Application to *108 the Commissioner of Corporations of the State of California (including any amendments and supplements thereto and applications for amended permits) for a permit or permits authorizing this corporation to sell and issue not to exceed seven thousand five hundred (7,500) shares of its Ten Dollar ($10.00) par value preferred stock and twenty-eight thousand (28,000) shares of its no par value common stock to the following, for the considerations set forth below: (A) To THE RYAN AERONAUTICAL Co., an aggregate of seven thousand five hundred (7,500) shares of preferred stock for cash at a price of Ten Dollars ($10.00) per share without a selling commission of any kind. (B) To THE RYAN AERONAUTICAL Co., twenty-four thousand (24,000) shares of common stock for cash at a price of One Dollar ($1.00) per share without a selling commission of any kind. (C) To FREDERICK E. BOND and HAROLD F. MEYER, four hundred (400) shares each of common stock in consideration of the transfer by BOND and MEYER to the corporation of all their right, title and interest in and to designs, ideas and know-how (including patent rights or rights in patent applications to which they have clear title) pertaining to *109 the fields of communications and electronics and for promotional services rendered to the corporation prior to the issuance of said shares, and for employment contracts executed by said FREDERICK E. BOND and HAROLD F. MEYER with the corporation. (D) To employees of the corporation, other than Frederick E. Bond and Harold F. Meyer, two thousand (2,000) shares of common stock in consideration for the transfer by said employees to the corporation of all their right, title, and interest in and to designs, ideas and know-how (including patent rights or rights in patent applications to which they may have clear title), pertaining to the fields of communications and electronics, and also in exchange for employment contracts as may be required by the Board of Directors. (E) To FREDERICK E. BOND and HAROLD F. MEYER, options to purchase six hundred (600) shares each of common stock for cash in the amount of One Dollar ($1.00) per share for a total of One Thousand Two Hundred Dollars ($1,200.00), to be exercised by said FREDERICK E. BOND and HAROLD F. MEYER on or before September 19, 1965. RESOLVED FURTHER: That the Board of Directors hereby determines that the fair value to this corporation *110 in monetary terms of the consideration for the issuance of said four hundred (400) shares each of common stock to FREDERICK E. BOND and HAROLD F. MEYER and said two thousand (2,000) shares of common stock to employees as specified in paragraph (D) above is equal to One Dollar ($1.00) per share or the sum of Two Thousand Eight Hundred Dollars ($2,800.00). 992 RESOLVED FURTHER: That upon the issuance of a Permit by the Commissioner of Corporations of the State of California pursuant to such Application, the Treasurer or the Secretary be and they hereby are authorized and directed to sell and issue shares of stock of this corporation to the persons and in the amounts and for the consideration stated in and in compliance with all the terms and conditions of such Permit and these resolutions. In the latter part of September 1960, Thompson, Nelson, Shinno, Fiden and Miller commenced working as full-time employees of Communications. Communications filed an application dated October 4, 1960, for a permit to issue and sell securities with the Division of Corporations of the State of California. This application states in part as follows: Applicant's initial capitalization will *111 consist of Seventy-Five Thousand Dollars ($75,000.00) in cash to be contributed by The Ryan Aeronautical Co. in exchange for the issuance of seven thousand five hundred (7,500) shares of Applicant's preferred stock; Twenty-Four Thousand Dollars ($24,000.00) in cash to be contributed by The Ryan Aeronautical Co. in exchange for the issuance of twenty-four thousand (24,000) shares of Applicant's common stock; in addition, it is proposed that Applicant issue to Frederick E. Bond, Applicant's President, and Harold F. Meyer, Applicant's Vice President, four hundred (400) of its common shares each in exchange for considerations set out below. It is further proposed that Applicant issue to employees of the corporation, other than Frederick E. Bond and Harold F. Meyer, two thousand (2,000) of its common shares in exchange for considerations set out below; and it is further proposed that Applicant grant to said Frederick E. Bond and Harold F. Meyer options to purchase six hundred (600) of its common shares each for cash in an amount of One Dollar ($1.00) per share for a total of One Thousand Two Hundred Dollars ($1,200.00) to be exercised by said Frederick E. Bond and Harold F. Meyer on or *112 before September 19, 1965. * * * Applicant hereby represents to the Commissioner of Corporations that it will not commence business before it has received the full cash purchase price of said seven thousand five hundred (7,500) shares of preferred stock and twenty-four thousand (24,000) shares of common stock, and the considerations as set out below for the eight hundred (800) shares to be issued to Frederick E. Bond and Harold F. Meyer. Applicant proposes to sell and issue to The Ryan Aeronautical Co. seven thousand five hundred (7,500) shares of its preferred stock at par in exchange for Seventy-Five Thousand Dollars ($75,000.00) cash without a selling commission of any kind; and to sell and issue to The Ryan Aeronautical Co. twenty-four thousand (24,000) shares of its no par common stock, in exchange for Twenty-Four Thousand Dollars ($24,000.00) in cash without a selling commission of any kind; and to sell and issue four hundred (400) of its common shares each to Frederick E. Bond and Harold F. Meyer in exchange for the transfer by said Frederick E. Bond and Harold F. Meyer of all their right, title and interest in and to designs, ideas and know-how (including patent rights *113 or rights in patent applications to which they have clear title) pertaining to the fields of communications and electronics, and for promotional services rendered to the corporation prior to the issuance of said shares, and also for employment contracts with the corporation, copies of which are attached hereto as Exhibit "D." Applicant further proposes to issue to employees of the corporation, other than Frederick E. Bond and Harold F. Meyer, two thousand (2,000) of its common shares in exchange for the transfer by said employees to the corporation of all their right, title and interest in and to designs, ideas and know-how (including patent rights or rights in patent applications to which they have clear title) pertaining to the fields of communications and electronics, and also for employment contracts with the corporation as may be required by Applicant's Board of Directors. The employees to whom such shares shall be issued and the number of shares to be issued to each such employee shall be determined by Applicant's Board of Directors. Applicant further proposes to grant options to Frederick E. Bond and Harold F. Meyer to purchase six hundred (600) of its common shares each *114 for cash in an amount of One Dollar ($1.00) per share for a total of One Thousand Two Hundred Dollars ($1,200.00) to be exercised by said Frederick E. Bond and Harold F. Meyer on or before September 19, 1965. A permit dated October 14, 1960, was issued to Communications by the Division of Corporations of the State of California. This permit provided in part as follows: 993 RYAN COMMUNICATIONS, INC., a California corporation, is hereby authorized to sell and issue its securities as hereinbelow set forth: 1. To sell and issue an aggregate of not to exceed 7,500 shares of its preferred stock to THE RYAN AERONAUTICAL Co., a California corporation, at par, for cash, lawful money of the United States, for the uses and purposes recited in its application filed on October 6, 1960, and so as to net applicant the full amount of the selling price thereof. 2. To sell and issue an aggregate of not to exceed 24,000 shares of its common stock to THE RYAN AERONAUTICAL Co., a California corporation, at $1.00 per share, for cash, lawful money of the United States, for the uses and purposes recited in its said application and so as to net applicant the full amount of the selling price thereof. *115 3. After applicant shall have sold, received the consideration for and issued all the shares authorized to be sold and issued under paragraphs 1 and 2 hereof, to sell and issue an aggregate of not to exceed 2,800 shares of its common stock to FREDERICK E. BOND and HAROLD F. MEYER and any or all bona fide employees of applicant in the manner, on the basis, for the considerations and to uses and purposes as set forth in said application. 4. On the basis and to uses and purposes as set forth in said application, to grant options to FREDERICK E. BOND and HAROLD F. MEYER, authorizing the purchase of not to exceed 1,200 shares of the applicant's common stock. 5. To sell and issue to any or all of the holders of the options authorized under issuance paragraph 4 hereof an aggregate of not to exceed 1,200 shares of its common stock at $1.00 per share, for cash, lawful money of the United States, for the uses and purposes recited in its said application, and so as to net applicant the full amount of the selling price thereof. On December 28, 1960, a special meeting of the board of directors of Communications was held. The following resolution was adopted at this meeting: RESOLVED: *116 That the Treasurer and Secretary of this corporation cause to be issued to the following named employees the number of common shares of this corporation as specified, in exchange for an agreement to be entered into by each of said employees, a copy of said agreement being attached hereto and incorporated as a part hereof: Name of employee
Number of shares
Kenneth A. Thompson
500
J. Robert Nelson
100
William H. Fiden
100
Bernard H. Dell
75
William G. Miller
25
Luie C. Shinno
25
The agreement referred to in the resolution apparently was not attached to the minutes of the meeting. There was enclosed with a letter dated January 6, 1961, written to Nelson by James R. Maurer (hereinafter referred to as Maurer), an attorney for Ryan during the periods here relevant, a draft of a "proposed Agreement to be signed by Ryan Communications' employees receiving common stock pursuant to prior agreements." The draft agreement is as follows: THIS AGREEMENT, made and entered in to this… day of..; 1961, by and between RYAN COMMUNICATIONS, INC., a California corporation, hereinafter referred to as "Communications", and..; hereinafter referred to as "Employee"; *117 WITNESSETH: WHEREAS, the Board of Directors of RYAN COMMUNICATIONS, INC. at a meeting duly held on December 28, 1960 passed certain resolutions approving the transfer of a specified number of common shares of RYAN COMMUNICATIONS, INC. to certain named employees in exchange for the transfer by said employees of all their right, title and interest in and to designs, ideas and know-how (including patent rights or rights in patent applications to which they have clear title) pertaining to the fields of communications and electronics, said transfer to be in accordance with the following: A Pre-Incorporation Agreement dated September 19, 1960 between THE RYAN AERONAUTICAL Co., FREDERICK E. BOND and HAROLD F. MEYER; a Permit to Sell and Issue RYAN COMMUNICATIONS, INC., common stock granted by the California Corporations Commissioner dated October 14, 1960; and the terms and conditions of an Agreement entered into between Employee and Communications as approved by said Board of Directors and in the form as set forth out below: NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter contained, the parties hereto agree as follows: 1. In consideration of the *118 transfer to Employee of… shares of the common stock of RYAN 994 COMMUNICATIONS, INC., Employee hereby transfers all his right, title and interest in and to designs, ideas and know-how (including patent rights or rights in patent applications to which he has clear title) pertaining to the fields of communications and electronics. As further consideration for the transfer of said stock, Employee agrees that if Employee voluntarily leaves the employment of Ryan Communications, Inc. prior to January 1, 1963, then and in that event Employee agrees to re-transter and assign or cause to be re-transferred and assigned to Communications said stock. In order to be able to carry out this Agreement, Employee agrees that prior to Jannuary 1, 1963 Employee will not divest himself of the means or power to so re-transfer to Communications said stock. 2. Communications hereby agrees to cause to be issued to Employees said… shares of common stock in exchange for the considerations set out in paragraph 1 above. IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written. RYAN COMMUNICATIONS, INC., a California corporation "Communications" *119 By: "Employee" A memorandum to Nelson from Maurer dated January 13, 1961, reads as follows: SUBJECT: Stock Transfer Agreements; forwarding of Enclosed is one copy each of the Stock Transfer Agreement signed by Mr. Stillwagen on behalf of Ryan Communications, and by Bond and Meyer. I am reviewing your suggestions regarding changes in the proposed Employment Contracts with the Ryan Management, and also your suggestion regarding the proposed Employees' Stock Transfer Agreement, and will forward to you revised Agreements as soon as possible. Separate proposed agreements, each dated January 26, 1961, between Communications and each of the petitioners were drawn up by Maurer. Each of these agreements contained the same provisions as the "Draft" agreement dated January 6, 1961, and read substantially the same as the draft except that the name of the employee and number of shares of stock to be issued to him appeared in the appropriate places which were blank in the draft agreement. In accordance with the permit issued by the Division of Corporations, Communications issued its stock as follows: No. of shares
Kind of stock
Par value per share
Issued to
7,500
Preferred
$10
Ryan
24,000
Common
1
Ryan
1,000
Common
1
Bond
1,000
Common
1
Meyer
500
Common
1
Thompson
100
Common
1
Nelson
100
Common
1
Fiden
25
Common
1
Miller
25
Common
1
Shinno
75
Common
1
Bernard H. Dell
*120 The stock certificate stubs in the stock certificate books of Communications show that the certificates were dated January 4, 1961. The books do not show the date the certificates were delivered. The certificates were delivered by Bond to each of petitioners sometime in January 1961. Bond, Meyer, and Thompson picked the certificates up in the office of Communications in San Diego on some day in January and Bond personally carried them on the following day to the plant in Los Angeles at which petitioners were then working and delivered them to petitioners. Ryan purchased the 7,500 shares of preferred stock and 24,000 shares of common stock for cash. Under agreements dated January 3, 1961, Bond and Meyer each transferred to Communications his right, title and interest in and to designs, ideas and know-how (including patent rights or rights in patent applications to which they had clear title) pertaining to the fields of communications and electronics as partial consideration for the transfer to him of 400 shares of common stock of Communications. Thompson and Nelson negotiated with Communications with respect to obtaining employment contracts with it but neither they nor any other *121 of petitioners entered into any written employment contract with Communications. Under date of March 17, 1961, Ryan addressed a letter to Bond and Meyer offering to transfer to them all the stock held by Ryan in Communications in return for Ryan being relieved of all obligation in connection with its agreement regarding Communications. Bond and Meyer did not accept this offer. Thereafter, Ryan offered to purchase all of the Communications' stock owned by Bond, Meyer, and petitioners at a price of $25 per share, which offer was accepted by all of these individuals. On 995 June 8, 1961, each of petitioners except Fiden entered into a contract with Ryan for the sale to Ryan of their stock in Communications. On June 12, 1961, Fiden entered into a similar contract with Ryan. On July 5, 1961, each petitioner sold all his Communications' stock to Ryan for $25 a share. On his income tax return for the calendar year 1961, Thompson reported income from Communications of $13,884.59 which was composed of salary in the amount of $13,384.59 and $500 as the value of 500 shares of common stock of Communications. The other petitioners did not report any amount as income on their income tax *122 returns for the year 1961 representing the value of the shares of stock issued to them by Communications. Each of petitioners reported on his Federal income tax return for the year 1961 the gain from the sale of his stock in Communications as long-term capital gain. Respondent in his notices of deficiency determined that the amount reported by each petitioner as long-term capital gain was short-term capital gain. Opinion The issue here is factual. The parties agree that if petitioners held their stock in Communications for more than 6 months, the gain on the sale of that stock is longterm capital gain. If they did not hold such stock for more than 6 months, the gain is short-term capital gain. Petitioners contend that when they commenced working for Communications they acquired an equitable interest in the common stock of that corporation and that their respective holding periods of their stock commenced on the date that they became employed by Communications. Respondent contends that petitioners have not met their burden of proving when they received delivery of their stock certificates thereby acquiring legal title to their stock and that they did not acquire equitable *123 ownership of their stock on or before January 4, 1961, which is the date on which their holding period must commence in order for their gain on the sale of the stock to be longterm capital gain, because they did not on or prior to that date fulfill the conditions prerequisite to their acquiring the right to stock. Petitioners sold their stock on July 5, 1961. To have held their stock for more than 6 months, they must have acquired it on or before January 4, 1961. E. T. Weir, 10 T.C. 966, aff'g 173 F. 2d 222 (C.A. 3, 1949). The respondent cites the California Uniform Stock Transfer Act section 2466, Cal. Corp. Code (West, 1955), [3] with respect to the methods of transfer of stock certificates to transfer legal title to the stock evidenced by such certificate. Respondent argues that petitioners have not shown that the stock certificates swre delivered to them on or before January 4, 1961, and therefore cannot rely on the transfer of legal title to the stock to them to support a holding period of over 6 months. We agree with respondent that the record lacks any certainty as to when the stock certificates were delivered to petitioners. All of the witnesses *124 testifying in this regard stated that delivery was around the first of the year 1961, or that it was sometime early in January. This testimony is too vague to support a finding that the stock certificates were delivered to petitioners on or before January 4, 1961. The inference from the evidence is that the certificates were delivered after January 4, 1961, since they are dated on that date and the indication from the evidence is that the 996 certificates were delivered subsequent to the date on which they were dated. *125 Petitioners do not specifically contend that they have established that the certificates were delivered to them on or before January 4, 1961, or that legal title to their stock was acquired on or before that date. Petitioners contend that they acquired an equitable interest in their stock in September 1960. Respondent does not contend that the transfer of legal title to the stock to petitioners is necessary to begin the holding period for the purposes of determining whether gain on the sale of the stock is long-term or short-term gain. He accepts petitioners' position that if they acquired all rights to their stock prior to the delivery to them of the certificates that their holding period would begin on the date all such rights to the stock were acquired for the purpose of determining whether gain on the sale of the stock was long or short-term gain. Respondent contends that it was necessary for petitioners to fulfill certain conditions before they could acquire their stock in Communications and that those conditions were not fulfilled until at least after January 6, 1961 and probably not until January 26, 1961 or thereafter. It is well established that a person can own stock without *126 having a certificate issued to him since the certificate is merely evidence of ownership of stock. Richardson v. Shaw, 209 U.S. 365 (1908). It is also well established that the holding period of property for the purposes of determining whether gain on the sale is long or short-term begins on the day the person first owned the property. McFeely v. Commissioner, 296 U.S. 102 (1935). Petitioners contend that they had substantially done what was required of them to obtain stock of Communications prior to the end of 1960 and therefore they obtained equitable interests in such stock prior to the end of the year 1960 sufficient to commence their holding periods. Petitioners rely on the case of W.F.Marsh, 12 T.C. 1083 (1949). In that case we held that the taxpayers' rights with respect to the issuance of stock were fixed when they performed their part of an agreement thereby becoming entitled to a specific number of shares of stock. We stated that the parties in their contract intended that all rights be fixed as of the date the taxpayers fully performed their part of the agreement and noted that they had so fully performed and that all that remained *127 to be done was the authorization and issuance of the common stock to the taxpayers and their associates. We distinguished the facts in that case from those in Ethlyn L. Armstrong, 6 T.C. 1166 (1946), aff'd 162 F. 2d 199 (C.A. 3, 1947). The taxpayers in Ethlyn L. Armstrong, supra, had prior to March 6, 1940, entered into an agreement to purchase 400 shares of stock for $240 per share. The agreement between the taxpayers and the seller provided that the taxpayers must pay the seller the full purchase price for the 400 shares plus 6 percent interest from March 6, 1940, before April 10, 1940. In order to stop the running of interest, the agreement also provided that the taxpayers could prepay the amount. On March 28, 1940 the taxpayers paid the full amount to the seller. We held that up until March 28, 1940, the taxpayers merely had an executory contract for the purchase of shares of stock. This executory contract did not amount to a contract of sale and therefore the taxpayers did not acquire their stock prior to March 28, 1940. We agree with respondent that under our holding in Ethlyn L. Armstrong, supra, a taxpayer does not "own" stock *128 which he has a contract to purchase earlier than the date he performs his part of the contract, thereby "paying" for the stock. Petitioners in the instant case have failed to show that they performed their part of their contract so as to have "paid" for their stock in Communications on or before January 4, 1961. The record as a whole shows only that petitioner had an agreement to enter into a contract with Communications. In September 1960, when petitioners came to work for Communications they had an understanding with Bond, Meyer and Thompson that they would at a future date and upon fulfilling certain conditions receive an unspecified amount of Communications' stock. Bond, Meyer and Thompson were representatives of Communications in procuring petitioners' services and agreeing that some stock would be issued to them. The Pre-Incorporation Agreement is dated September 19, 1960, the date of Communications' incorporation. This Pre-Incorporation Agreement contains some reference to the fact that 2,000 shares were to be set aside to be distributed to employees. A similar reference is made in the minutes of the first meeting of the board of directors. The 2,000 shares to be issued to *129 employees is referred to in the application to and in the permit granted by the Commissioner of Corporations. The application to the Corporation Commissioner 997 of California for issuance of shares made in October 1960 states that the employees to whom the shares are to be issued and the number of shares to be issued to each is to be determined by the Board of Directors. This is a clear indication that Communications had no agreement with petitioners as to the precise number of shares to be issued to them at the time they commenced working for that corporation in September 1960. The minutes of the special meeting of the board of directors held on December 28, 1960, show a total of 825 shares allocated to petitioners and one other employee aside from Bond and Meyer. There is nothing in the record to indicate, except as to Thompson, that the number of shares to be received by each employee was even discussed until the meeting of the board of directors in December 1960. Even Thompson's discussion refers to his receiving one-half the amount of stock received by each Bond and Meyer and not a precise number of shares. However, as of December 28, 1960, there was a definite agreement *130 as to how much stock each petitioner was to receive if certain conditions were fulfilled. It is, therefore, necessary to consider what performance each was to render in order to be entitled to receive this stock. The stock was issued for petitioners' agreeing to render services to Communications and for the transfer by petitioners of their right, title and interest in and to designs, ideas, know-how, and patent rights. The minutes of the board of directors' meeting refer to the fact that the petitioners were to execute a certain agreement. The record does not precisely show to what agreement reference was made in the minutes of the board of directors of December 28, 1960. The inference is, however, that the reference was to an agreement by each petitioner to transfer all right, title and interest in and to designs, ideas, knowhow, and patent rights to Communications. There is no evidence that such agreements were entered into prior to January 4, 1961. Reference is made to a draft of a proposed agreement which is to be entered into in a letter dated January 6, 1961. The date appearing on the proposed agreements is January 26, 1961. The record does not contain any executed written agreements. *131 There is testimony that such written agreements were signed at some time. However, there is no indication in the testimony that such agreements were signed on or before January 4, 1961. Since the reference in the minutes of December 28, 1960, to an agreement to be entered into is to "a copy of said agreement being attached hereto," the fair inference is that the agreement which petitioners were to enter into was to be a written agreement. However, the fact that the exact terms of a written agreement were still under discussion on January 13, 1961, raises an inference that no firm oral agreement had been entered into as of that date. We, therefore, do not agree with petitioners' contention that as of January 4, 1961, such an oral agreement had been entered into and the execution of a written agreement was a mere formality. Petitioners argue that the record shows that their stock certificates were delivered before the written contracts were signed and that this fact supports their position that signing the written contracts was a mere formality. The record is not clear that the stock certificates were delivered before written contracts were signed but even if such fact were proved, it *132 would not establish that acceptable oral contracts were agreed to prior to January 4, 1961. The inference is that no agreement was reached earlier than January 6, 1961 and probably not until after January 13, 1961. The burden of proof is on petitioners and on the facts contained in this record they have failed to show that they had performed their part of the contract so as to be entitled to their stock in Communications on or before January 4, 1961. We, therefore, conclude that petitioners have failed to prove that they had any ownership of the stock on or before that date. Based on this conclusion, we hold that petitioners have not shown that they held their stock for more than 6 months at the date of the sale of that stock on July 5, 1961. Therefore, we hold that the gain of each petitioner on the sale of his stock was short-term capital gain. Because other issues have been disposed of by the parties, Decision will be entered under Rule 50. 998 Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Luie Shinno and Ruth Shinno, Docket No. 5130-66; William H. Fiden and Ruth G. Fiden, Docket No. 5131-66; William G. Miller, Docket No. 5132-66; and Kenneth A. Thompson and Nayda A. Thompson, Docket No. 5133-66.↩
2. Respondent does not now contend that the total amount received by petitioners from the sale of their stock was ordinary income but only that the gain on the sale is short-term capital gain. Each petitioner now agrees that to the extent of $1 per share the value of the stock received is ordinary income and that the $1 is his basis in the stock.↩
3. Cal. Corp. Code, sec. 2466 (West, 1955) Sec. 2466. Transfer of title; manner; effect of provision that shares transferable only on corporate books or by registrar or transfer agent. Title to a certificate and to the shares represented thereby can be transferred only in the manner specified in one of the following subdivisions: (a) By delivery of the certificate endorsed either in blank or to a specified person by the person appearing by the certificate to be the owner of the shares represented thereby. (b) By delivery of the certificate and a separate document containing a written assignment of the certificate, or a power of attorney to sell, assign, or transfer the certificate or the shares represented thereby, signed by the person appearing by the certificate to be the owner of the shares represented thereby. Such assignment or power of attorney may be either in blank or to a specified person. (c) By delivery of the certificate with an assignment endorsed thereon or in a separate instrument signed by the trustee in bankruptcy, receiver, guardian, executor, administrator, or other person duly authorized by law to transfer the certificate on behalf of the person appearing by the certificate to be the owner of the shares represented thereby. The provisions of this section shall control although the charter or articles of incorporation or by-laws of the corporation issuing the certificate, or the certificate itself, provide that the shares represented thereby shall be transferable only on the books of the corporation or shall be registered by a registrar or transferred by a transfer agent.↩